# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**ELIZABETH TRUSLER,**

      **Plaintiff,**

  v.                                                                  Civil Action 2:17-cv-1047
                                                                      Judge Algenon L. Marbley
                                                                      Magistrate Judge Jolson

**COMMISSIONER OF SOCIAL
SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Elizabeth Trusler, filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying her Title II Social Security Disability Benefits. For the reasons that follow, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 11) be **OVERRULED**, and that judgment be entered in favor of Defendant.

**I. BACKGROUND**

    **A. Prior Proceedings**

Plaintiff filed an application for Title II Social Security Disability Benefits on October 23, 2013, alleging disability beginning October 8, 2012. (Tr. 88, PAGEID #: 143). After Plaintiff's application was denied initially and on reconsideration (Tr. 88–96, 98–114, PAGEID #: 143–51, 153–69), Plaintiff filed a Request for Hearing by an Administrative Law Judge (Tr. 175, PAGEID #: 231). Administrative Law Judge Christopher Tindale (the "ALJ") held a hearing on August 11, 2016. (Tr. 50–87, PAGEID #: 104–141). On September 29, 2016, the ALJ issued a decision finding that Plaintiff was not disabled as defined in the Social Security

Act. (Tr. 11–24, PAGEID #: 65–78). The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (*Id.*, Tr. 1, PAGEID #: 55).

Plaintiff filed this case on December 1, 2017 (Doc. 2), and the Commissioner filed the administrative record on February 8, 2018 (Doc. 10). Plaintiff filed a Statement of Specific Errors (Doc. 11), the Commissioner responded (Doc. 12), and Plaintiff filed a Reply (Doc. 13).

### B. Relevant Testimony at the Administrative Hearing

Plaintiff testified that she stopped working as a rental clerk for a car rental agency in 2012, due to her left foot surgery. (Tr. 55, 57, PAGEID #: 109, 111). Plaintiff explained that although she tried to avoid surgery "for a number of years," she couldn't get any relief from her pain. (Tr. 59, PAGEID #: 113). Following surgery, her left foot "was slow healing, and that's when [she] lost [her] job of 25 years." (Tr. 57, PAGEID #: 109). Plaintiff testified that despite the surgery, she still experiences pain in her feet almost immediately upon standing; however, she experiences relief when walking. (Tr. 60–61, PAGEID #: 114–15). Plaintiff described her pain as "feel[ing] like a very bad stone bruise in my heels." (Tr. 61, PAGEID #: 115). Plaintiff estimated that she could walk for forty-five minutes before the pain increased to the point where she feels as if she might fall. (Tr. 61–62, PAGEID #: 115–16).

Plaintiff also testified that she began experiencing back problems in 1994, and she described her current back conditions as "the same" as they were in the 1990s. (Tr. 62–63, PAGEID #: 116–17). Plaintiff and her attorney had the following exchange regarding her back:

> Plaintiff: [I]f I do sweeping, vacuuming, raking, shoving [sic], when I first do any of that I start feeling pain. And then I will keep going until it's to where I can't take it, which is really sharp. And I'll just stand up and just stop for a few minutes, and do a little bit more, and then stop, you know, until I can hopefully try to attempt to do my - whatever I'm doing, you know.

2

> Atty: So activity causes your back to get worse? Is that what you were saying?
>
> Plaintiff: Yeah. And it's the leaning over that, I mean it's instant. If I lean over to go try to pick up something like, you know, some potatoes or something. You know, I mean I just feel it. So but when I stand up, okay, then the sharp pain, you know, just subsides until I'm doing something else again. And then, again, you know, like if I'm standing at the kitchen sink, and then, you know, chopping onions, chopping bell peppers, you know, shredding carrots or something, I am like uh, you know. It's like I try to do what I can a little at a time, so that I don't have to feel all that at one time.
>
> Atty: All right [sic]. Now what sort of timeframe are we looking at here? How long are you able to stand and do these activities before you need to take a rest?
>
> Plaintiff: [I]t depends on the activity. I am good for like two hours and then for two and a half.

(Tr. 63–64, PAGEID #: 117–18). As an example, Plaintiff testified that she was able to organize her RV for two hours, while only needing to sit down "maybe once or twice just for a few minutes." (Tr. 64, PAGEID #: 118). However, Plaintiff stated that when she helped her stepdaughter shovel debris or took dishes "to the church to clean them up and scrub them," she wasn't able to do those activities for two hours because it required constant movement. (*Id.*). Plaintiff later testified that she thought she could stand or sit for approximately an hour and then needs to "get up and kind of move around." (Tr. 66, PAGEID #: 120).

Plaintiff also stated that she suffered from headaches. (Tr. 73, PAGEID #: 127). When asked by her attorney to describe her headaches and discuss the frequency in which she experiences headaches, she testified as follows:

> Plaintiff: They, actually, they've gotten a little better. I used to have them absolutely every day, and two or three times a day I was constantly taking stuff. So I just feel like now it, it's some, of course, stress headaches. And sometimes, just like yesterday, I had a really bad one. I don't know. Sometimes you try to figure out why you have a headache, and I just couldn't figure it out. I don't know. It just happens. And -

3

> Atty: How often do you have them now?
>
> Plaintiff: I am probably now just having them about three or four times a week.
>
> Atty: How long do they last?
>
> Plaintiff: Probably until I can take something strong. Well, to me, it's like a BC powder[1] that works three minutes until I can get it nipped in the bud. But if it doesn't help nip it in the bud, I'll take another BC powder in about another 30 minutes, you know, in there.
>
> Atty: Okay. So 30 minutes to an hour they're lasting?
>
> Plaintiff: Uh-huh.
>
> Atty: All right. How severe are they?
>
> Plaintiff: They're not as bad as they used to be.
>
> \*\*\*
> Atty: Okay. When you're having these headaches, are you able to do what you're normally doing, or do you need to stop, take breaks?
>
> Plaintiff: Well, no. Yeah, I can do. I just feel nauseated. I just need some relief, you know, to do whatever and doing it a little bit more comfortable.

(Tr. 73–74, PAGEID #: 127–28).

In terms of other physical impairments, Plaintiff testified that she experiences pain in her tailbone due to several falls and a previous incident in 1985 where she cracked her tailbone. (Tr. 66–67, PAGEID #: 120–21). Plaintiff also stated that she experiences pain in her hips due to bursitis, but her hip pain only occurs when she is lying down. (Tr. 69, PAGEID #: 123). Further, Plaintiff testified that she experiences aching legs, shoulders, and neck due to fibromyalgia. (Tr. 70, PAGEID #: 124). Finally, Plaintiff described some mental impairments relating to her concentration, focus, and memory. (Tr. 72–73, PAGEID #: 126–27).

---

[1] BC Powder is an over-the-counter analgesic pain reliever. *See* http://www.bcpowder.com/, last visited May 25, 2018.

As for daily activities, Plaintiff testified that she walks more frequently after moving from her RV into a house (Tr. 75, PAGEID #: 129); she showers a couple times a week (*id.*); she makes smoothies or sandwiches for lunch (Tr. 75–76, PAGEID #: 129–30); she organizes the kitchen or other rooms in the house (*id.*); she lays down "around the noonish hour" for about two hours (Tr. 76, PAGEID #: 130); and then she makes "something quick and easy" for dinner (*id.*), although she makes more complicated meals once or twice a week (Tr. 79, PAGEID #: 133). Plaintiff also testified that she and her husband are both responsible for chores around the house, but her husband lifts anything that is heavy and she stated she doesn't vacuum or bend over. (Tr. 75, 77–78, PAGEID #: 129, 131–32). Further, Plaintiff testified that she tries to drive as little as possible because it hurts her heel, feet, right leg, back, and tailbone, yet she acknowledged that she drove 181 miles to her hearing. (Tr. 79, PAGEID #: 133)

Following Plaintiff's testimony, vocational expert William Cody (the "VE") testified regarding Plaintiff's previous work history and her ability to work in her current condition:

> Q: Would you please identify the past work that the claimant performed in the last 15 years?
>
> A: The rental car clerk job performed was done to the light level of physical demand, semiskilled work activity, SPV of 4. . . .
>
> Q: Mr. Cody, I'd like you to assume a person of the claimant's age, education and work experience, who is able to perform light work. This individual could occasionally climb ramps and stairs, but never climb ladders, ropes or scaffolds. The individual could occasionally stoop, kneel, crouch, crawl, and frequently reach overhead bilaterally. Could frequently handle bilaterally. Can an individual with these limitations perform the claimant's past work, as the claimant performed it, or as it's customarily performed?
>
> A: Yes, sir. They could perform the past relevant work activity.
>
> Q: Is that as customarily and as generally, as she performed it as well?

A: Both. Yes, sir.

(Tr. 81–82, PAGEID #: 135–36). The VE also testified that assuming those same limitations, there would be significant other jobs in the national economy that such a person could perform as well. Further, even when the ALJ reduced the hypothetical individual to sedentary work, with the same opined limitations, the VE testified that there would still be jobs in the national economy that the individual could perform. (Tr. 82–83, PAGEID #: 136–37). Finally, the VE testified that if the hypothetical individual was off task for 20% of the work day or missed more than four days of work per month, there would be no jobs that individual could perform. (Tr. 84, PAGEID #: 138).

### C. Relevant Medical Background

On October 8, 2012, Plaintiff underwent an endoscopic plantar fasciotomy on her left foot to treat her plantar fasciitis. (Tr. 268, PAGEID #: 328). Despite the surgery, Plaintiff reported "continued pain around the heel[,]" so she underwent a motor conduction study to evaluate for possible tarsal tunnel entrapment on April 9, 2013. (Tr. 287, PAGEID #: 347). The study, however, was "essentially normal . . . without clear evidence of tarsal tunnel entrapment noted." (*Id.*).

Plaintiff saw Dr. William D. Padamadan on January 30, 2014, for a consultative examination at the request of the Ohio Disability Determinations Services. (Tr. 296, PAGEID #: 356). At the evaluation, Plaintiff described having issues with her feet, back, hips, knees, and tailbone, although Dr. Padamadan noted that she had no swelling, induration, or redness of the heal or legs, no edema of the legs, her pedal pulses were intact, and her side bends and rotation were normal. (Tr. 296–98, PAGEID #: 356–58). Plaintiff made no mention of headaches. Dr.

Padamadan opined in the "Final Diagnosis" section that Plaintiff suffered from obesity, hypertension, had a "[h]istory of fibromyalgia without trigger points of fibromyalgia[,]" and "[n]on-specific history of numbness of the hips, tailbone, hands, and knees without any demonstrable neurological deficits or dysthesia." (Tr. 298, PAGEID #: 358). Dr. Padamadan ultimately concluded as follows:

> I do not see any contraindication for her to perform work related activities of Avis Rental Car sales activities. She should be able to sit, stand, walk at least half a block at a time and climb a flight of stairs. Her ADL and IADL activities are intact. She should be able to lift and carry at least 10–20 pounds frequently and occasional lifting of more than 20 pounds.

(*Id.*).

Plaintiff began treating at Just Chiropractic Clinic with Dr. Jason R. Just, D.C. on April 10, 2014, for her back and foot pain. (Tr. 352, PAGEID #: 412). Plaintiff stated she believed her symptoms were aggravated by activities involving standing, lifting, walking, bending, twisting, house chores, and sitting. (*Id.*). Plaintiff saw Dr. Just multiple times a week until May 16, 2014. (Tr. 352–86, PAGEID#: 412–46). At those appointments, Plaintiff described her back pain ranging (on a scale from zero to ten) anywhere from a two to a six, and she described her foot pain ranging from a two to a nine. (*Id.*). Plaintiff's pain tended to be higher after days she reported moving boxes and packing. (*See, e.g.*, Tr. 361, 365, 367, 371, PAGEID #: 421, 425, 427, 431)

On June 2, 2014, Plaintiff underwent a mental status examination at the request of the Ohio Division of Disability Determination. (Tr. 406, PAGEID #: 466). At the appointment, Plaintiff reported problems with discs in her back, arthritis, numbness in her hands and hips, and pain in her lower back, but made no mention of headaches. (*Id.*). Plaintiff stated that on a

typical day she wakes up between 9:00–10:00 a.m., "does dishes, spends time with her grandchildren and drinks her juice and protein shakes." (Tr. 408, PAGEID #: 468). Plaintiff also stated that "she enjoys helping others and having people over, but [] that cooking meals sometimes takes her all day due to her physical limitations." (*Id.*). Further, Plaintiff reported that she is able to shop for groceries, read, pay bills, and take care of bathing and grooming, but when she does a lot of physical activity, she is "spent" the next day. (*Id.*).

Plaintiff had an MRI of her thoracic spine, lumbar spine, and cervical spine on June 19, 2014, due to her low back pain. (Tr. 415–17, PAGEID #: 475–77). The thoracic spine MRI showed normal alignment, no abnormal bone marrow signal, and was deemed "unremarkable." (Tr. 415, PAGEID #: 475). The lumbar spine MRI showed mild degenerative disease at L4-5 and L5-SI but with no evidence of stenosis or nerve root contact. (Tr. 416, PAGEID #: 476). Finally, the cervical spine MRI was also deemed "unremarkable" and it was noted that there were "no findings to explain upper extremity radicular symptoms." (Tr. 417, PAGEID #: 477).

Pursuant to Nurse Practitioner Kim Crum's referral, Plaintiff had an MRI of her brain stem for her "chronic headaches" on September 9, 2014. (Tr. 456, PAGEID #: 516). The MRI revealed a middle cranial arachnoid cyst, but no underlying reactive change was seen in the anterior left temporal lobe, nor was there significant intracranial mass effect, suggesting that this was "a long-standing finding." (*Id.*). Treatment notes state that despite the cyst, the findings were "within normal limits." (Tr. 471, PAGEID #: 531). Ms. Crum then referred Plaintiff to Dr. Jay Bauerle for her headaches. (Tr. 487, PAGEID #: 547).

On October 23, 2014, Plaintiff saw Dr. Bauerle and stated her headache symptoms had been present for approximately twenty years, occur daily, sometimes last all day, and cause

nausea, photophobia, and phonophobia. (*Id.*). Dr. Bauerle diagnosed Plaintiff with "migraine without aura." (Tr. 490, PAGEID #: 550). Plaintiff underwent a CT of her brain in April 2015 that again noted her arachnoid cyst but revealed no evidence of acute intracranial abnormality. (Tr. 645, PAGEID #: 706). A May 2016 CT of the brain found the arachnoid cyst remained stable and noted no other issues. (Tr. 646, PAGEID #: 707)

Plaintiff saw Dr. GurPreet Brar on October 30, 2014, for her back and heel pain. (Tr. 495, PAGEID #: 555). Dr. Brar opined that x-rays of her sacroillac joints are normal, and although an MRI of the lumbar spine revealed disc degeneration between L4-L5 and L5-S1, the sacroiliac joints do not reveal any evidence of bone marrow edema. (*Id.*). Dr. Brar noted that Plaintiff "was educated that at this time there is no evidence to support the diagnosis of an inflammatory spondyloarthropathy." (*Id.*). Ultimately, Dr. Brar recommended a program of back strengthening, weight loss to get down to her ideal BMI, appropriate orthosis, and heel cups in both shoes. (*Id.*).

Plaintiff again saw Dr. Just in May 2015, although this time it was for back and tailbone pain. (Tr. 597, PAGEID #: 658). After six appointments, Dr. Just released Plaintiff because she had no significant progress, and recommended she follow up with her family doctor. (Tr. 597–608, PAGEID #: 658–69). Fifteen months later, Dr. Just completed a form titled "General Physical Impairments," and opined that Plaintiff could work one hour per day, stand for 30 minutes at a time for one hour total per day, sit for two hours at a time, and sit for four hours total per day. (Tr. 724, PAGEID #: 785). Dr. Just also opined that Plaintiff could occasionally lift ten pounds, frequently lift five pounds, and occasionally bend and stoop. (*Id.*). Finally, Dr. Just stated that Plaintiff would be absent more than four days per month and would be off-task

9

15–20% of the workday due to her impairments. (Tr. 425, PAGEID #: 786).

### D. State Agency Assessments

On February 8 2014, state agency physician Dr. Esberdado Villanueva opined that Plaintiff could occasionally lift and/or carry twenty pounds, could frequently life and/or carry ten pounds, could stand or walk approximately six hours in an eight hour workday, and could sit approximately six hours in a workday. (Tr. 93–95, PAGEID #: 148–50). State agency physician Dr. William Bolz made identical findings at the reconsideration level on September 8, 2015. (Tr. 111–13, PAGEID #: 166–68).

### E. The ALJ's Decision

The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2017, and had not engaged in substantial gainful activity since October 8, 2012. (Tr. 13, PAGEID #: 67). Further, the ALJ opined that Plaintiff suffered from the following severe impairments: degenerative disc disease; degenerative joint disease; fibromyalgia; obesity; hip bursitis; and disorders of the feet. (*Id.*). The ALJ also found that although Plaintiff was diagnosed with gastroesophageal reflux disease, sinusitis, rhinitis, rash, hyperlipidemia, obstructive sleep apnea, hypertension and diabetes mellitus, these impairments did not "more than minimally affect the claimant's ability to engage in basic work-related activities," and were therefore classified as non-severe. (Tr. 15, PAGEID #: 69).

Despite Plaintiff's impairments, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 17, PAGEID #: 71). In reaching that conclusion, the ALJ explicitly stated that he had considered Plaintiff's hip impairments under Listing 1.02 and her degenerative disc

disease under Listing 1.04, but the record failed to show Plaintiff met the required elements of those listings. (*Id.*).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ stated:

[T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except for the following restrictions: She can occasionally climb ramps and stairs, but can never climb ladders, ropes, or scaffolds. She can occasionally stoop, kneel, crouch and crawl. She can perform frequent overhead reaching bilaterally, and frequent handling bilaterally.

(*Id.*).

The ALJ assigned significant weight to the state agency medical consultants' opinions that indicated Plaintiff could perform light work subject to postural and manipulative restrictions. (Tr. 20, PAGEID #: 74). The ALJ explained that Dr. Villanueva and Dr. Bolz's opinions warranted significant weight because they generally comported with the record, "including the claimant's unremarkable diagnostic imagery findings and conservative treatment history." (*Id.*). Because the most recent state agency opinion was form September 2014, however, the ALJ included additional limitations in the RFC because they "could not have considered all the evidence presently in the record." (*Id.*).

The ALJ also assigned significant weight to Dr. Padamadan's opinion, explaining that it too was consistent with the medical evidence. (*Id.*). The opinions of Dr. Just, on the other hand, were assigned little weight. (Tr. 21, PAGEID #: 75). The ALJ stated that Dr. Just provided an inconsistent assessment that the medical evidence did not support: "For example, he noted that the claimant could work only one-hour a day but could stand for one hour, and sit for up to four hours during an eight-hour workday." (*Id.*). The ALJ also noted that as a chiropractor, Dr. Just was not an acceptable medical source under Social Security standards, and further explained his

11

decision to assign his opinions little weight:

> Prior to rendering [his] assessment in August 2016, [Dr. Just] had treated the claimant intermittently since April 2014. Specifically, Dr. Just treated the claimant for a little over a month from April to May 2014, during which time he saw the claimant several times a week (12F). About a year later, he treated the claimant several more times in May 2015 (28F). This opinion does not comport with the other evidence, as the claimant's self-professed daily activities establish that she could work for more than an hour a day. Furthermore, unremarkable diagnostic findings and the improvement that the claimant realized from conservative treatment undermine other aspects of Dr. Just's assessment, including his finding that she would frequently be off task and would miss work several times a month. Dr. Just did not present much relevant evidence or offer much explanation for his findings. Instead, he only cited several of the claimant's symptoms and subjective complaints of pain (33F/1). Dr. Just's specialized expertise as a chiropractor lends limited weight to his assessment. As noted above, Dr. Just's assessment contains several internal inconsistencies. Therefore, this assessment warrants little weight.

(*Id.*).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). "Therefore, if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

## III. DISCUSSION

Plaintiff asserts three assignments of error: (1) the ALJ failed to recognize that Plaintiff's headaches were severe impairments; (2) the ALJ erroneously found that Plaintiff could perform work at the light-exertion level in the opined RFC; and (3) the ALJ failed to find Plaintiff disabled per Medical-Vocational Rule 201.14. (Doc. 11).

### A. Plaintiff's Headaches

Plaintiff argues that "[d]espite the medical evidence of migraine headaches and [her] testimony regarding the frequency and severity of these headaches, the ALJ failed to recognize them as a severe impairment." (Doc. 11 at 11). According to Plaintiff, this omission was significant "given the vocational expert's testimony that a person who is off-task 20% of the workday or who misses more than four days of work per month would not be able to sustain competitive employment." (*Id.* at 12). In other words, Plaintiff avers that if the ALJ would have recognized her headaches as severe, her RFC "may have been significantly different" and could have resulted in a finding of "disabled" based on the VE's testimony. (*Id.*). The Court disagrees.

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any *medically determinable physical or mental impairment*[.]" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651–52 (6th Cir. 2009) (citing 42 U.S.C. § 423(d)(1)(A)). The Social Security regulations make clear that an individual's symptoms, "such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect [an individual's] ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present." 20 C.F.R. § 404.1529. Indeed,

"[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques, must show the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* Ultimately, a claimant bears the burden of demonstrating that he or she suffers from a medically determinable impairment. *See Watters v. Comm'r of Soc. Sec. Admin.*, 530 F. App'x 419, 421 (6th Cir. 2013).

As the Commissioner correctly notes, Plaintiff points to no objective medical findings that would lead the ALJ to conclude that her headaches qualify as a medically determinable impairment, let alone a severe impairment. Although Plaintiff states that she suffers from headaches at least three to four times per week, and explains that they have caused photophobia, phonophobia, and nausea (Doc. 11 at 11), Plaintiff is unable to articulate or reference any medical record that documents any *limitations* she has as a result of her headaches. *See Maddin v. Astrue*, No. CIV.A. 10-259-GWU, 2011 WL 3104076, at *3 (E.D. Ky. July 26, 2011) (holding that "the mere diagnosis of [] [migraines] says nothing about its severity under the regulations, and it is still the plaintiff's burden to show functional limitations resulting from the condition") (citing *Foster v. Bowen*, 853 F.2d 483, 489 (6th Cir. 1988)). Additionally, diagnostic testing did not reveal any objective source or cause of her alleged headaches. Instead, Plaintiff cites to records that demonstrate she complained of headaches, but as noted above, this allegation of pain alone is insufficient to qualify as a medically determinable impairment. *See, e.g.*, *Snowden v. Colvin*, No. 1:14-CV-599, 2015 WL 5679619, at *3 (S.D. Ohio Sept. 28, 2015); *see also Maddin*, 2011 WL 3104076, at *3 (holding that the ALJ did not err in finding Plaintiff's

migraines were not a medically determinable impairment because, *inter alia*, there was no "objective medical findings to support the plaintiff's description of her migraines").

Plaintiff also made no mention of her headaches when she applied for benefits (Tr. 197, PAGEID #: 255), and she consistently failed to mention headaches as an impairment. (*See* Tr. 296, PAGEID #: 356 (Plaintiff complained of plantar fasciitis, fibromyalgia, back pain, and numbness, but not headaches at a January 30, 2014 consultative examination); Tr. 210, PAGEID #: 268 (Plaintiff did not mention headaches in a disability report she completed in March 2014); Tr. 332, PAGEID #: 392 (Plaintiff denied any headaches at an April 10, 2014 physical examination); Tr. 228, PAGEID #: 286 (Plaintiff failed to state headaches were disabling in an October 2014 form). These omissions offer additional support for the ALJ's determination that Plaintiff's headaches were not a severe impairment. *See Griffith v. Colvin*, No. 6:13-23, 2013 WL 5536476, at *3 (E.D. Ky. Oct. 7, 2013) (holding that because, *inter alia*, the plaintiff did not allege an intellectual impairment in her application for SSI, evidence supported ALJ's conclusion that the plaintiff did not have a medically determinable intellectual impairment). Further, as the government notes, Plaintiff suggested at her administrative hearing that her headaches had improved, were well-controlled with over-the-counter medication, and did not prevent her from performing her normal daily activities. (Doc. 12 at 6; *see also* Tr. 73–74, PAGEID #: 127–28).

Finally, even if the Court assumed that the ALJ erred in not finding Plaintiff's headaches to be a "severe" limitation, such error was harmless. *Snowden v. Colvin*, No. 1:14-CV-599, 2015 WL 5679619, at *4.

> This is because the regulations require that if one "severe" impairment exists, all impairments—severe or otherwise—must be considered in the remaining steps of

> the sequential analysis. 20 C.F.R. §§ 404.1523, 416.923, 404.1545(e)). Thus, where an ALJ errs in finding a particular impairment "non-severe" in step two of the analysis, the error is harmless if the ALJ finds at least one severe impairment and continues to address each impairment in determining the claimant's RFC. *Meadows v. Comm'r of Soc. Sec.*, No. 1:07cv1010, 2008 WL 4911243, at *13 (S.D. Ohio 2008) (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

*Id.*

Here, the ALJ's decision indicates that he properly considered and addressed all of Plaintiff's severe and non-severe impairments in determining his RFC. In light of Plaintiff's testimony, objective testing showing no definitive causes of headaches, and Plaintiff's disability paperwork omitting headaches as an impairment, the Court finds that substantial evidence supports the ALJ's conclusion that Plaintiff's headaches were not a separate medically determinable impairment.

### B. Plaintiff's RFC

Plaintiff next argues that "the ALJ's reasoning is not sufficient for reasonable minds to conclude that she is capable of the ALJ's established RFC." (Doc. 11 at 13). Specifically, Plaintiff believes that the "[l]imitations noted in her medical records as well as those to which [she] testified" demonstrate she is not capable of performing work that is consistent with the RFC. (*Id.*).

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The Social Security regulations, rulings, and Sixth Circuit precedent provide that the ALJ is charged with the final responsibility in determining a claimant's residual functional capacity. *See, e.g.*, 20 C.F.R.

§ 404.1527(d)(2) (the final responsibility for deciding the residual functional capacity "is reserved to the Commissioner"). And it is the ALJ who resolves conflicts in the medical evidence. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). In doing so, the ALJ is charged with evaluating several factors when determining the RFC, including the medical evidence (not limited to medical opinion testimony), and the claimant's testimony. *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004)). Nevertheless, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).

Here, the ALJ's RFC was well supported by both medical evidence and Plaintiff's testimony. The ability to perform light work is defined generally as lifting or carrying ten pounds frequently, but no more than twenty pounds, and requires "a good deal of walking or standing" or sitting with some pushing and pulling. 20 C.F.R. § 404.1567. And the ALJ reached his conclusion that Plaintiff was capable of light work, with some added restrictions, based on the three acceptable medical sources that had opined on Plaintiff's functional limitations. For example, Dr. Padamadan opined that Plaintiff was capable of sitting, standing, walking at least half a block, and climbing stairs, and that she could lift and carry ten to twenty pounds frequently. (Tr. 298, PAGEID #: 358). Further, Dr. Padamadan's physical evaluation did not reveal any abnormal findings. (Tr. 296–98, PAGEID #: 356–58). Similarly, the state agency physicians opined that Plaintiff could lift or carry twenty pounds occasionally and ten pounds frequently, and could stand, sit or walk for six hours in a workday. (Tr. 93–95, 111–13, PAGEID #: 148–50, 166–68). The ALJ assigned these opinions significant weight, explaining

17

that the opinions were consistent with Plaintiff's unremarkable diagnostic imagery findings and conservative treatment history. (Tr. 20, PAGEID #: 74).

Plaintiff attempts to rebut these opinions by pointing to Dr. Just's records and her own testimony that she believes supports a more limited RFC. However, as the ALJ accurately explained, as a chiropractor, Dr. Just was not an acceptable medical source. *Garcia v. Comm'r of Soc. Sec.*, 105 F. Supp. 3d 805, 810 n.4 (S.D. Ohio 2015) ("[A] chiropractor is not considered an 'acceptable medical source,' and, instead, is considered an 'other source.'") (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir. 1997); 20 C.F.R. § 404.1513(d)(1)). Even still, the ALJ gave a detailed explanation for why Dr. Just's opinion was granted little weight and discussed explicitly the internal inconsistencies in Dr. Just's opinions. (*See* Tr. 21, PAGEID #: 75). Additionally, the ALJ's opinion found that Plaintiff's reported activities—such as shoveling debris and moving boxes—were inconsistent with her allegations of debilitating impairments. (Tr. 19, PAGEID #: 73). Further, despite Plaintiff's purported limitations in sitting and driving, she was able to drive 180 miles to the hearing with only one break. (*Id.*). Thus, Plaintiff's testimony and daily activities appear to be inconsistent with a more limited RFC. *See Rodriguez v. Comm'r of Soc. Sec.*, No. 16-11523, 2017 WL 1362701 (E.D. Mich. Feb. 21, 2017) (noting that claimant's daily activities, including cleaning, driving, shopping, and walking three city blocks demonstrated a greater RFC than alleged).

Finally, the ALJ noted that diagnostic studies showed only mild degenerative changes in Plaintiff's back and she underwent conservative treatment for her pain. (Tr. 19–20, PAGEID #: 73–74); *see also McKenzie v. Comm'r of Soc. Sec.*, No. 99-3400, 2000 WL 687680 *4 (6th Cir. May 19, 2000) (Plaintiff's non-aggressive treatment undermined his complaints of disabling

pain). Moreover, the ALJ explained that the medical evidence did not substantiate Plaintiff's allegations of debilitating foot problems, as her postoperative motor conduction study yielded normal results. (Tr. 20, PAGEID #: 74).

In light of the above, the undersigned finds that the "record as a whole"—including Plaintiff's own statements, her activities of daily living, and the medical record—contain substantial evidence to support the ALJ's RFC decision. *See Berry v. Astrue*, No. 1:09cv000411, 2010 WL 3730983, at *5 (S.D. Ohio June 18, 2010).

### C. Medical-Vocational Rule 201.14

Finally, Plaintiff argues that "[i]f the ALJ had properly found that [she] was only capable of work at the sedentary-exertion level . . . , a finding of 'disabled' would be warranted in this claim per the Medical-Vocational guidelines." (Doc. 11 at 15). Specifically, Plaintiff avers that because she was just two months shy of her fiftieth birthday on her alleged onset date, she should have been considered as an individual "closely approaching advanced age." (*Id.*).

"An ALJ can use Medical–Vocational guidelines or 'grids' ... at the fifth step of the disability determination after the claimant has been found not to meet the requirements of a listed impairment, but found nevertheless incapable of performing past relevant work." *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 714 (6th Cir. 2013) (quoting *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 855 (6th Cir. 2010)). As an initial matter, Plaintiff was found capable of performing her past relevant work at step four. (Tr. 22–23, PAGEID #: 76–77). But even assuming, *arguendo*, that Plaintiff was not capable of her past work, Plaintiff's argument is premised upon a finding limiting her to the sedentary exertion level. No such finding, however, was made. Instead, the ALJ held that Plaintiff was capable of performing range of light work—a finding

that the undersigned found was supported by substantial evidence. Thus, a finding that Plaintiff is disabled pursuant to Medical Vocational Rule 201.14 is not appropriate.

## IV. CONCLUSION

For the reasons stated, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 11) be **OVERRULED** and that judgment be entered in favor of Defendant.

### Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1). Failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140, 152–53 (1985).

IT IS SO ORDERED.


Date: May 31, 2018  /s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE